IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
E D
JAN 28 2004
Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| COLLEEN MAHAN, Individually | § | |
| and on behalf of LANNY BLAINE | § | |
| ROBINSON, Deceased, and | § | |
| the ESTATE OF LANNY BLAINE | § | |
| ROBINSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-02-1435 |
| | § | |
| CITY OF HOUSTON, TEXAS, | § | |
| MARK R. PRENDERGAST,[1] | § | |
| Individually, and JIMMY D. | § | |
| CARGILL, Individually, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending are Defendant Mark R. Prendergast's Second Motion to
Dismiss, or, in the Alternative, Motion for Summary Judgment
(Document No. 53), Defendant City of Houston's Motion for Summary
Judgment (Document No. 54), and Defendant Jimmy D. Cargill's Second
Motion to Dismiss, or, in the Alternative, Motion for Summary
Judgment (Document No. 57).  After carefully considering the
motions, responses, replies, and applicable law, the Court
concludes as follows:[2]

---

[1] Some documents mistakenly refer to Officer Prendergast as
Officer "Pendergast," which accounts for the misspelling of
Prendergast in certain quoted material herein.

[2] Also pending are Defendants' Motion for Leave to File
Supplemental Evidence and Amend Daubert Motion to Strike
Plaintiffs' Expert Opinion Testimony (Document No. 55), Defendant



## I.  Background

This is a 42 U.S.C. § 1983 claim for use of excessive force filed against The City of Houston ("City"), Houston Police Department ("HPD") Officer Mark R. Prendergast ("Officer Prendergast"), and HPD Officer Jimmy D. Cargill ("Officer Cargill").  On April 19, 2000, Officers Cargill and Prendergast were engaged in an undercover narcotics operation known as a "buy-walk," in which the officers would pose as purchasers of crack cocaine in order to obtain information about the source of the cocaine.

At a trailer on Howard Avenue, the officers located a man known to them as "Popeye," who was in fact Larry Robinson.  Based on an earlier conversation with Robinson, the officers had determined that Robinson could lead them to a source of crack

---

City of Houston's Motion to Strike Opinion Testimony of Plaintiff's Expert Witness Roger Clark (Document No. 56), and Defendant City of Houston's Amended Motion to Strike Plaintiffs' Expert Witness, Roger Clark's Testimony (Document No. 65), and Plaintiff's FRCP 56(g) Motion for Fees and Contempt Because Defendant Jimmy D. Cargill Filed a Summary Judgment Affidavit in Bad Faith (Document No. 67).  The Court has considered Roger Clark's opinion to the extent that it is admissible, and determined that it does not prejudice Defendants as to the outcome of Defendants' current dispositive motions.  The motions for leave to file supplemental evidence and to strike Roger Clark's testimony are therefore DENIED, subject to being re-urged at trial.  As to Plaintiff's motion for fees and contempt, the City of Houston's response to this motion (Document No. 72) shows that the apparent discrepancies in Officer Cargill's testimony can be reconciled or adequately explained.  The Court is not persuaded that the affidavit was filed in bad faith.  The Motion is therefore DENIED.

cocaine if they came to Howard Avenue at 6:30 p.m. on April 19, 2000. Upon arrival at the trailer, the officers noticed that Robinson appeared to be somewhat intoxicated and was acting erratically. Although the officers had not revealed their true identities, Robinson seemed reluctant to ride in the officers' unmarked car. After the officers demonstrated, at Robinson's demand, that the rear doors of the car could be opened from the inside, Robinson agreed to join the officers and climbed into the backseat, carrying with him a can of tomato juice and a bottle of vodka. Officer Prendergast sat in the front passenger seat while Officer Cargill took the wheel. Robinson directed the officers to proceed to Scott Street. According to Officer Prendergast, while all three of them were on Interstate 45 en route to Scott Street, Robinson warned Officer Prendergast that Prendergast had better not be a police officer. Officer Prendergast replied that he was not and was out on parole. When Robinson asked to see Officer Prendergast's parole card, Officer Prendergast stated that he had left it in his truck. According to Officer Prendergast, Robinson then became very upset and pulled a knife either out from under his armpit or from the can while saying "I'll show you." Officer Prendergast claims that he only had a moment to say "knife!" and reach for his concealed firearm, a 9mm semiautomatic pistol. He maintains that Robinson started towards Officer Cargill with the knife and, in fear for Officer Cargill's life, he (Officer

Prendergast) fired at Robinson.  Officer Prendergast contends that his shots seemed either not to hit Robinson or not to affect him, and so he (Officer Prendergast) fired several more times at Robinson until he felt Robinson was no longer a threat.  Officer Prendergast shot Robinson a total of seven times, inflicting wounds to Robinson's head, right hand, right forearm, and torso.  Officer Cargill contends that he then pulled the car over to the right shoulder of I-45, exited the car, drew his own firearm and opened the rear left door of the car, but did not shoot as he considered Robinson to no longer be a threat.

The officers claim they then radioed dispatch to advise of the shooting, although the recording of the dispatch has been mis-placed.  Firefighters dispatched to the scene pronounced Robinson dead upon their arrival.  The only knife recovered from Robinson was a folding knife located in the pocket of his pants.  No knife was located in the undercover car.  A serrated knife was located on the right shoulder of the highway about 300 feet behind the stopped car.  The vehicle's rear door windows, however, were closed at the time of the shooting, as indicated by the blood splattered on the inside of them.  No DNA or latent fingerprints were detected on the serrated knife.

Plaintiff Collen Mahan ("Plaintiff"), Robinson's mother, filed suit in her individual capacity, in behalf of her deceased son, Lanny Robinson, and as representative of the Estate of Robinson

4

pursuant to the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem Code. Ann. § 71.004, and the Texas Survival Statute. Plaintiff alleges that Officers Cargill and Prendergast violated Robinson's constitutional rights when Officer Prendergast shot Robinson because the force used was objectively unreasonable and excessive. Plaintiff also alleges that the City of Houston ("City") is liable because it maintained deficient policies on the use of deadly force that caused Robinson's death, and because the City failed adequately to train, supervise, and discipline Officers Cargill and Prendergast.

In its prior Memorandum and Order entered February 7, 2003, (Document No. 34) the Court dismissed Plaintiff's state law negligence claims against the City. The Court further held that the officers' motions to dismiss would be granted unless Plaintiff filed an amended complaint "pleading with particularity all material facts that she contends will establish her right to recovery under 42 U.S.C. § 1983, including detailed facts supporting the contention that the Defendants' plea of immunity cannot be sustained." Plaintiff filed her Second Amended Complaint (Document No. 35) on February 26, 2003.

II. <u>Pending Motions</u>

Officers Prendergast and Cargill renew their motions to dismiss, and in the alternative move for summary judgment based on

their affirmative defense of qualified immunity.  The officers contend that Plaintiff has failed to state the violation of a constitutional right, and that in any event, their actions under the circumstances were objectively reasonable.

The City moves for summary judgment on Plaintiff's § 1983 claims, contending that neither officer committed a constitutional violation, and that Plaintiff has failed to identify a City policy or custom that served as the moving force behind the alleged Fourth Amendment violations.  In addition, the City argues that as a matter of law the officers were adequately trained, supervised, and disciplined.

## III.  Standards of Review

The individual officers have moved for dismissal under Rule 12(b)(6) and, in the alternative, for summary judgment.  The City has moved for summary judgment.

### A.  Motion to Dismiss

Rule 12(b)(6) authorizes the dismissal of a claim for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), a court may not look beyond the face of the pleadings. Classroom Teachers of Dallas v. Dallas Indep. Sch. Dist., 164 F. Supp.2d 839, 845 (N.D. Tex. 2001). Moreover, a district court must liberally

6

construe the allegations in the complaint in favor of the plaintiff and must accept as true all well-pleaded facts in the complaint. Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997).

Dismissal of a claim is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000). "A plaintiff, however, must plead specific facts, not mere conclusory allegations, to avoid dismissal." Classroom Teachers of Dallas, 164 F. Supp.2d at 845. "A motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'" Collins, 224 F.3d at 498 (quoting Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1050 (5th Cir. 1982)).

B.   Summary Judgment Standard

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to inter-rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *See* id. at 2553-54. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *See* Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2514-15 (1986)). "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *See* Anderson, 106 S. Ct. at 2513-14. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. (citing Anderson, 106 S. Ct. at 2511). Even if the standards of Rule 56 are met, a court has discretion to deny a motion for

summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

Plaintiff has filed numerous objections to the summary judgment evidence, including objections to: exhibits A and B to Officer Cargill's Motion for Summary Judgment; exhibits A, B, and C to Officer Prendergast's Motion for Summary Judgment, and exhibits A-F, inclusive, to the City of Houston's Motion for Summary Judgment. Plaintiff has not cited any authority in support of her objections. In addition the objections are cursory. With the exception of Plaintiff's objection to the expert report of C.A. McClelland (Document No. 53 ex. C., Document No. 54 ex. D), which is hearsay, *see* <u>Wittmer v. Peters</u>, 87 F.3d 916, 917 (7th Cir. 1996), Plaintiff's objections are OVERRULED. Plaintiff's objection to the unverified expert report of C. A. McClelland is SUSTAINED.

## IV. <u>Discussion--Individual Liability</u>

Officers Prendergast and Cargill argue that they are entitled to summary judgment based on qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil damages liability *if* their actions were *objectively reasonable* in light of then clearly established law." <u>Bazan ex rel. Bazan v. Hidalgo County</u>, 246 F.3d 481, 488 (5th Cir. 2001). For qualified immunity to apply

> "the defendant official must initially plead his good
> faith and establish that he was acting within the scope
> of his discretionary authority.  Once the defendant has
> done so, the burden shifts to plaintiff to rebut this
> defense by establishing that the official's allegedly
> wrongful conduct violated clearly established law."

Id. at 489 (quoting Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir.

1992) (citations omitted)).

Assessing a qualified immunity defense requires a two-step

analysis.

> First, we must determine "whether the facts alleged,
> taken in the light most favorable to [Plaintiff], show
> that the officer's conduct violated a constitutional
> right."  Price v. Roark, 256 F.3d 364, 369 (5th Cir.
> 2001)) (citing Saucier v. Katz, 533 U.S. 194, 200, 150 L.
> Ed. 2d 272, 121 S. Ct. 2151 (2001)). If there is no
> constitutional violation, our inquiry ends. However, if
> "the allegations could make out a constitutional
> violation, we must ask whether the right was clearly
> established--that is whether 'it would be clear to a
> reasonable officer that his conduct was unlawful in the
> situation he confronted.'" Id.

Mace v. City of Palestine, 333 F.3d 621, 623-24 (5th Cir. 2003).

In evaluating whether Plaintiff has stated a constitutional

violation, the Court must look to current applicable constitutional

standards. Rankin v. Klevenhagen, 5 F.3d 103, 108 (5th Cir. 1993).

"However, '[t]he objective reasonableness of an official's conduct

must be measured with reference to the law as it existed at the

time of the conduct in question.'" Id. (quoting Mouille v. City of

Live Oak, 918 F.2d 548, 551 (5th Cir. 1990)).

It is well settled that claims involving claims of excessive
force are based upon an alleged violation of the Fourth Amendment.
*See* Graham v. Connor, 109 S. Ct. 1865, 1867-68 (1989). To prevail
on her claim of excessive force under the Fourth Amendment,
Plaintiff must do more than allege that the individual officers
used excessive force. Jackson v. City of Beaumont Police Dep't,
958 F.2d 616, 620 (5th Cir. 1992). She must plead specific facts
that if proved would overcome the individual officer's qualified
immunity defense. Id. To state a claim of excessive force "a
plaintiff must allege (1) an injury, which (2) resulted directly
and only from the use of force that was clearly excessive to the
need; and the excessiveness of which was (3) objectively
unreasonable." Bazan, 246 F.3d at 487-88.

In this case, Plaintiff's § 1983 claim is predicated on
allegations of not only excessive force, but deadly force. In
particular, Plaintiff contends that the deadly force used against
Robinson was objectively unreasonable and therefore a violation of
the Fourth Amendment. "Deadly force is a subset of excessive
force. Deadly force violates the Fourth Amendment *unless* 'the
officer has probable cause to believe that the suspect poses a
threat of serious physical harm, either to the officer or to
others.'" Bazan, 246 F.3d at 487-88 (quoting Tennessee v. Garner,
105 S. Ct. 1694, 1701 (1985)). "Use of deadly force is not
unreasonable when an officer would have reason to believe that the

11

suspect poses a threat of serious harm to the officer or others."
<u>Mace</u>, 333 F.3d at 624. "Accordingly, deciding what occurred when
deadly force was employed obviously will control whether the
[officer's] conduct was *objectively reasonable*; therefore, those
facts are material." <u>Bazan</u>, 246 F.3d at 492. The reasonableness
of an officer's belief as to the appropriate level of force should
be judged from an "on-scene" perspective, rather than the "'20/20
vision of hindsight.'" <u>Saucier</u>, 121 S. Ct. at 2151 (quoting <u>Graham
v. Connor</u>, 109 S. Ct. 1856, 1872 (1989)).

Plaintiff in her Second Amended Complaint alleges that "Lanny
Blaine Robinson, 49 years old, was shot ten times with a 9mm
handgun at point blank range by Houston Police Officer Mark R.
Pendergast, working undercover, while in the back seat of a car
driven by Houston Police Officer Jimmy D. Cargill, working
undercover, near 6600 Gulf Freeway (Interstate 45) in Houston,
Harris County, Texas, on the northbound side [sic] April 19, 2000.
Officers Pendergast and Cargill allege that Robinson pulled a knife
in the undercover car leading to his fatal shooting." Document
No. 35 ¶ 10. The Complaint then makes the following allegations:

1.   "Lanny had multiple contusions of the trunk and
     extremities consistent with a severe beating before
     death." Document No. 35 ¶ 22.

2.   "Officers Pendergast and Cargill did not suffer a
     scratch, abrasion, contusion, cut or any injury
     whatsoever." <u>Id.</u> ¶ 23

3. "Lanny had a blood alcohol level of 0.25%, over three times the limit for adult DUI in Texas." Id. ¶ 24.

4. "Larry Blaine Robinson was right-handed and Gunshot wounds G and H go through this open right hand in a manner consistent with a non-aggressive, defensive posture. Lanny had his hand open in a vain attempt to shield himself from the gunfire coming from Officer Pendergast in the front seat." Id. ¶ 28.

5. "Right-handed Lanny--with bullets passing through his open right hand--could not be holding a knife or any weapon with his open right hand." Id. ¶ 29.

6. "The alleged knife was not found on Lanny nor in the undercover car. Several individuals who were with Lanny that day up until Lanny got into the car with the officers state that Lanny had no knife nor any place to conceal a knife." Id. ¶ 30.

7. "Gunshot wounds E and F are perforating wounds of Lanny's right arm consistent with the same non-aggressive defensive posture referenced above." Id. ¶ 31.

8. "By the pattern of bullets it is consistent with Lanny cowering in the corner of the backseat." Id. ¶ 32.

Document No. 35 ¶¶ 22-24, 28-32.


A.   Officer Cargill


The facts alleged in Plaintiff's Second Amended Complaint are insufficient to raise a § 1983 claim against Officer Cargill. Plaintiff does not allege that Cargill did anything other than drive the car at the time Robinson was shot. Moreover, there are no allegations in the Complaint of a conspiracy involving Officer Cargill. While Plaintiff raises conspiracy allegations in response

13

to Cargill's Second Motion to Dismiss, such allegations are not in the Complaint. "Plaintiffs who assert conspiracy claims under civil rights statutes must *plead* the operative facts upon which their claim is based." Lynch v. Canatella, 810 F.2d 1363, 1369-70 (5th Cir. 1987) (emphasis added). Plaintiff's allegation of a conspiracy and cover-up neither appears in Plaintiff's Second Amended Complaint nor follows from the facts pleaded therein. Plaintiff cannot now raise it as an alternative theory of recovery.

Plaintiff has failed to "enunciate a set of facts that illustrate [Cargill's] participation in the wrong alleged." Jacquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986).[3] Therefore, Plaintiff's § 1983 claim against Officer Cargill will be dismissed. Defendant Cargill's Second Motion to Dismiss is GRANTED.

B.  Officer Prendergast

Plaintiff's allegations support Plaintiff's claim against Prendergast "'with sufficient precision and factual specificity to raise a genuine issue as to the illegality of [Prendergast's]

---

[3] Although "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983, Plaintiff's Second Amended Complaint does not allege that Officer Cargill, who was driving an automobile on an interstate highway in Houston, "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995).

conduct at the time of the alleged acts.'"   Baker v. Putnal,
75 F.3d 190, 195 (5th Cir. 1996) (quoting Schultea v. Wood, 47 F.3d
1427, 1434 (5th Cir. 1995) (en banc)).   If proved, Plaintiff's
allegations indicate that Officer Prendergast used excessive force
against Robinson (1) that was objectively unreasonable, and
(2) that a reasonable officer in such circumstances would have
known was unlawful.  Accordingly, Officer Prendergast's Motion to
Dismiss will be denied.

     With respect to Officer Prendergast's Alternative Motion for
Summary Judgment, Prendergast argues that his use of deadly force
was neither excessive nor objectively unreasonable because he was
responding to a threat of serious physical harm that Robinson posed
to both officers.  Plaintiff's § 1983 claim against Prendergast, as
well as Prendergast's qualified immunity defense, hinge on this
matter--whether Officer Prendergast reasonably believed that
Robinson posed a threat of serious physical harm to either officer.
If Officer Prendergast reasonably believed Robinson posed a threat
of serious physical harm, Prendergast's use of deadly force was
neither a Fourth Amendment violation nor objectively unreasonable
under Garner.   On the other hand, if Prendergast did not have
reason to believe Robinson posed a threat of serious physical harm,
the deadly force was both excessive and objectively unreasonable.

     There is a genuine issue of material fact as to whether
Officer Prendergast reasonably believed that Robinson posed a

threat of serious physical harm.   There is sworn testimony from Officer Prendergast that he "shot Mr. Robinson only after Mr. Robinson threatened the officers with a knife."   Document No. 53 ¶ 4.4.   This is the only summary judgment evidence that Robinson threatened the officers with a knife, and it comes from Officer Prendergast, a highly interested witness in this case.   Under such circumstances, the Court has good reason to be cautious:

> The award of summary judgment to the defense in deadly force cases may be made only with *particular care where the officer defendant is the only witness left alive to testify.*   In any self-defense case, a defendant knows that *the only person likely to contradict him or her is beyond reach.*   So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial.

<u>Bazan</u>, 246 F.3d at 492 (quoting with implied approval dicta from <u>Plakas v. Drinski</u>, 19 F.3d 1143, 1147 (7th Cir.) (emphasis added), <u>cert. denied</u>, 115 S. Ct. 81 (1994)).   Although Officer Cargill was also present when Officer Prendergast shot Robinson, the summary judgment evidence indicates that Cargill was driving the car at the time, never saw the alleged knife, and does not believe he could identify it.   *See* Document No. 57 ex. B; Document No. 68 ex. 2, at 127.[4]   Consequently, Officer Prendergast is the sole source of

---

[4] In his affidavit Officer Cargill states: "While en route to purchase the crack cocaine, Mr. Robinson became agitated and I heard Officer Prendergast say he (Mr. Robinson) had a knife. Officer Prendergast shot Mr. Robinson."   Document No. 57 ex. B.   In

direct evidence that Robinson threatened the officers with a knife. "'Cases that turn crucially on the credibility of witnesses' testimony in particular should *not* be resolved on summary judgment.'" Bazan, 246 F.3d at 492 (quoting Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999)).

Furthermore, Plaintiff points to circumstantial evidence that calls into question Officer Prendergast's version of events. In a sworn witness statement, Officer Prendergast stated that Robinson, riding as a passenger in the backseat of the officers' undercover car, warned Prendergast that he had better not be a police officer. Prendergast responded that he was out on parole. Robinson asked to see the parole card, and Prendergast replied that he had left it in his truck. Then, according to Prendergast,

> [Robinson] seemed to lose it. He started stating very aggressively that he was a schizophrenic and that 'I'll show You" as he was saying, he also reached either under his armpit or into the can and pulled out a knife. I only had a moment to say knife as I reached for my weapon. He was less than a foot to a foot and a half from officer Cargill's neck. As he stated I'd show you, he pulled the knife and started toward officer Cargill with the knife in his hand. Fearing for officer Cargill's life I began to fire at the suspect. It seemed that either I was not hitting him or that my rounds were having no effect. His body was reacting but it did not appear to stop him instantly. I fired approximately 5-6 times at the suspect before I felt there was no longer a threat to either officer Cargill or myself.

---

a prior deposition Cargill stated that he had never seen the alleged knife and could not now identify it. *See* Document No. 68 ex. 2, at 127.

17

*See* Document No. 53 ex. A.   In a subsequent deposition,
Prendergast could not offer any real details about the alleged
knife other than that he saw a blade.[5]   *See* Document No. 69 ex. 2,
at 38.   Nor did he recall seeing anything happen to the knife once
he started shooting Robinson.   Id. at 41.   The summary judgment
evidence shows that the only knife recovered from Robinson was a
folding knife located *inside the pants pocket* of Robinson's corpse,
and that no other knife was recovered from the car.   *See* id. ex. 1,
at 000136.   Although a knife with a 3.5 inch serrated blade
("serrated knife") was recovered from the right shoulder of the
highway some 300 feet behind the officers' vehicle, the
investigator's report notes that the rear door windows of the car
had been *closed* at the time of the shooting, as indicated by the
blood splattered on the inside of them.   *See* id. ex. 1, at 000149.
The driver's door window was down only 6-7 inches, the passenger
side front window was down only 2 inches, and the serrated knife
was found on the *right* shoulder of the road.   Document No. 69 ex.
1, at 000149.   A police lab report states that "blood was indicated
on the knife," but does not specify if this was the folding knife
taken from the deceased's right front pocket or the serrated knife
found on the highway shoulder.   Id. at 000155.   A subsequent police

_____

    [5] When asked in the deposition what kind of blade it was,
Officer Prendergast responded: "It was just a blade.   It looked
sharp.   And my eyes made contact with it and it was a knife."
Document No. 69 ex. 2, at 38.

lab report states that no DNA type was detected on "the knife." Id. at 000169.  A separate police lab report states that no latent prints were identified on the "steak knife," presumably the serrated knife found 300 feet away from the car.  Id. at 000161.

Given that the reasonableness of Officer Prendergast's actions is predicated on his solo version of events, and given that there is scant circumstantial evidence to corroborate his version, see Bazan, 246 F.3d at 492, genuine issues of material fact preclude summary judgment.[6]  Consequently, Officer Prendergast's Motion for Summary Judgment will be denied.

## V. Discussion--Municipal Liability

The City argues that it is entitled to summary judgment (1) because Officer Prendergast's conduct did not amount to a constitutional violation, and (2) there is no City policy that can be established to be the moving force behind the alleged violation. As is clear from the analysis of Officer Prendergast's Motion for Summary Judgment, fact issues preclude the City from prevailing on

---

[6] In opposing the motions for summary judgment, Plaintiff complains about the alleged spoliation of evidence, including a missing dispatch tape, missing serrated knives, and contamination of the scene of the shooting.  This alleged spoliated evidence is relevant, if at all, to Plaintiff's claims against Officer Prendergast and Prendergast's version of events.  It has no applicability to the basis for municipal liability alleged in this case.  Given that there are genuine issues of material fact that preclude summary judgment for Officer Prendergast, the spoliation issue may be raised at trial.

its first argument.  The Court therefore turns to the issue of municipal policy.

A municipality can be held liable under § 1983 only when the municipality itself causes a constitutional deprivation.  *See* City of Canton v. Harris, 109 S. Ct. 1197, 1203 (1989); Monell v. Dept. of Soc. Servs., 98 S. Ct. 2018, 2037-38 (1978).  This requires the execution of an official city policy or custom which results in the injury made the basis of the § 1983 claim.  Bd. of County Comm'rs v. Brown, 117 S. Ct. 1382, 1388 (1997); Monell, 98 S. Ct. at 2035-36.  There are two fundamental requirements for holding a city liable under § 1983: culpability and causation.  *See* Brown, 117 S. Ct. at 1388; Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998).  "First, the municipal policy must have been adopted with 'deliberate indifference' to its known or obvious consequences. Second, the municipality must be the 'moving force' behind the constitutional violation."  Snyder, 142 F.3d at 795; Brown, 117 S. Ct. at 1394; Canton, 109 S. Ct. at 1204-05.  *See* Piotrowski v. City of Houston, 237 F.3d 567 (5th Cir. 2001) ("[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.").  A high standard of proof is required before a municipality can be held liable under § 1983.  *See* Snyder, 142 F.3d at 796; *see also* Brown, 117 S. Ct. at 1394 (stating that "[w]here a court fails to adhere to rigorous

20

requirements of culpability and causation, municipal liability
[inappropriately] collapses into respondeat superior liability");
Canton, 109 S. Ct. at 1208 (stating that § 1983 liability should
not be imposed absent a showing of "a high degree of fault on the
part of city officials" (O'Connor, J., concurring)).

"[E]ach and any policy which allegedly caused constitutional
violations must be specifically identified by a plaintiff, and it
must be determined whether each one is facially constitutional or
unconstitutional." Piotrowski, 237 F.3d at 579-80. An official
policy is defined as

> 1.   A policy statement, ordinance, regulation, or
> decision that is officially adopted and promulgated by
> the municipality's lawmaking officers or by an official
> to whom the lawmakers have delegated policy-making
> authority; or
>
> 2.   A persistent, widespread practice of city officials
> or employees, which, although not authorized by
> officially adopted and promulgated policy, is so common
> and well settled as to constitute a custom that fairly
> represents municipal policy. Actual or constructive
> knowledge of such custom must be attributable to the
> governing body of the municipality or to an official to
> whom that body had delegated policy-making authority.

Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992). "[P]roof of a
custom or practice requires more than a showing of isolated acts
. . . ." Burge v. St. Tammany Parish, 336 F.3d 363, 370 (5th Cir.
2003). The narrow "single incident" exception to this rule applies
"only where the facts giving rise to the violation are such that it
should have been apparent to the policymaker that a constitutional

violation was the highly predictable consequence of a particular policy or failure to train." Id. at 373.

To establish municipal liability for inadequate training, supervision, or discipline, Plaintiff must show (1) inadequate training, supervision, or disciplinary procedures; (2) that such inadequate procedures caused the alleged constitutional violation (in this case, the alleged unlawful use of deadly force); and (3) the deliberate indifference of municipal policymakers in establishing the allegedly inadequate procedures. See Burge, 336 F.3d at 370. See also Pineda v. City of Houston, 291 F.3d 325, 332 (5th Cir. 2002) (inadequate training). The adequacy of such procedures must be evaluated "in relation to the tasks *the particular officers must perform*." Pineda, 291 F.3d at 332 (emphasis in original). Only where the allegedly inadequate training, supervision, and disciplinary procedures of a municipality evidence a "'deliberate indifference' to the rights of its inhabitants can such [] shortcoming[s] be properly thought of as a city 'policy or custom' that is actionable under § 1983." Canton, 109 S. Ct. at 1205. Only where a municipality's procedures "reflect[] a 'deliberate' or 'conscious' choice by a municipality --a "policy" as defined by our prior cases--can a city be liable for such a failure under § 1983." Id. The need for "more or different" training, supervision, or discipline must be "so obvious, and the inadequacy so likely to result in the violation of

22

constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id.

Plaintiff contends that Officer Prendergast's alleged use of objectively unreasonable deadly force was "in compliance with [the City's] deficient actual policies.  Procedures, practices, and customs relating to the use of force, including deadly force." [sic]  Document No. 35 ¶ 55.  Specifically Plaintiff alleges that the City provides its officers with "too much discretion in determining whether to use excessive force without considering less drastic alternatives," that these "deficient actual policies" amount to deliberate indifference to a citizen's right not to be subjected to objectively unreasonable deadly force, and that these policies proximately caused Robinson's death. See id. Plaintiff further alleges that the City failed adequately to train Officer Prendergast in the use of deadly force, failed adequately to supervise him, and failed adequately to discipline him.

The City's formal written policy on the use of deadly force, HPD General Order 600-17, states the following:

> The use of deadly force will be limited to those circumstances in which an employee reasonably believes it is necessary to protect himself or another from the imminent threat of serious bodily injury or death.

> Employees will not justify the use of deadly force by intentionally placing themselves in imminent danger (e.g. placing themselves in front of moving vehicles).

23

Use of firearms in the following ways is prohibited:

a. Firing warning shots.

b. Firing at fleeing suspects who do not represent an imminent threat to the life of the officer or another.

c. Firing at a suspect whose actions are only a threat to the suspect himself (e.g., attempted suicide).

Document No. 54 ex. F. This written policy is facially constitutional in that it permits the use of deadly force only well within the limits expressed by the Supreme Court in Garner, and as interpreted in this circuit. *See* Mace, 333 F.3d at 624 ("Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others."). Indeed, the policy is more restrictive of an officer's discretion than the City of Arlington's deadly force policy upheld by the Fifth Circuit in Fraire v. City of Arlington, 957 F.2d 1268 (5th Cir. 1992).

In Fraire the Fifth Circuit held that Arlington's deadly force policy fell within the bounds of Garner even though the policy did not preclude an officer from placing himself in front of an oncoming vehicle where the utilization of force was a likely outcome. *See* id. at 1280-81. HPD General Order 600-17, by contrast, forbids this practice. *See* Document No. 54 ex. F. As expressed in HPD General Order 600-17, the City's policy does not provide officers with too much discretion in the use of deadly force, because Garner does not proscribe the use of deadly force

24

where "an employee reasonably believes it is necessary to protect himself or another from the imminent threat of serious bodily injury or death." Document No. 54 ex. F.

Furthermore, "[w]here . . . as in the present case, an alleged policy or custom is facially innocuous, establishing the requisite official knowledge requires that a plaintiff establish that an official policy was 'promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result.'" Burge, 336 F.3d at 370 (quoting Piotrowski, 237 F.3d at 579). Plaintiff points to no summary judgment evidence establishing that constitutional violations would obviously result from the application of this policy. Plaintiff's single expert states that HPD's narcotics abatement procedures are "seriously flawed" and that the narcotics unit in which Officers Cargill and Prendergast worked used unnecessary and dangerous tactics. See Document No. 70 ¶¶ 49-51. This does not explain how HPD's policy would obviously result in the unreasonable use of deadly force, particularly given that a threat of serious physical harm is to be evaluated "regardless of what transpired up until the shooting itself . . . ." Fraire, 957 F.2d at 1276. In addition, "plain- tiffs generally cannot show deliberate indifference through the opinion of only a single expert." Conner v. Travis County, 209 F.3d 794, 798 (5th Cir. 2000).

Regarding alleged policies based on custom or practice, Plaintiff fails to provide summary judgment evidence revealing a "persistent, widespread practice" of police officers improperly resorting to deadly force, much less one "so common and well settled as to constitute a custom that fairly represents municipal policy." Johnson, 858 F.2d at 94. Plaintiff makes reference to several other shootings involving HPD officers, including Officers Prendergast and Cargill, but does not explain how these shootings involved an improper use of excessive or deadly force. As set forth above, "proof of custom or practice requires more than a showing of isolated acts . . . ." Burge, 336 F.3d at 370.

As for Plaintiff's allegations of inadequate training, the summary judgment evidence shows that Officer Prendergast has completed training, both at the police academy and in the HPD, which meets and exceeds the requirements of the state-mandated Texas Commission Law Enforcement Officers Standard Education ("TCLOSE"). See Document No. 54 ex. B. At least one court has held that compliance with state-mandated training procedures is sufficient to prevail over an inadequate training claim. See Huong v. City of Port Arthur, 961 F. Supp. 1003, 1006 (E.D. Tex. 1997). Furthermore, the summary judgment evidence shows that Officer Prendergast has completed extensive specialized narcotics training, including instruction on concealed weapons and reactive shooting. See Document No. 54 ex. B. It will not suffice to

26

> prove that an injury or accident could have been avoided
> if an officer had had better or more training, sufficient
> to equip him to avoid the particular injury-causing
> conduct.  Such a claim could be made about almost any
> encounter resulting in injury, yet not condemn the
> adequacy of the program to enable officers to respond
> properly to the usual and recurring situations with which
> they must deal.  *And plainly, adequately trained officers
> occasionally make mistakes; the fact that they do says
> little about the training program or the legal basis for
> holding the city liable.*

Pineda, 291 F.3d at 333 (quoting Canton, 109 S. Ct. at 1206).

Even if the City's training procedures were inadequate and
Officer Prendergast improperly used deadly force, however, the
summary judgment evidence does not reveal deliberate indifference
by municipal policymakers.  "Deliberate indifference generally
requires that a plaintiff demonstrate 'at least a pattern of
similar violations' arising from training that is so clearly
inadequate as to be 'obviously likely to result in a constitutional
violation.'"  Burge, 336 F.3d at 370.  Plaintiff refers to other
shootings involving Officer Prendergast, but aside from conclusory
statements by Plaintiff's expert, Plaintiff does not explain how
these shootings involved an improper use of deadly force or how
such force was an obvious result of clearly inadequate training
provided by the City to its officers.

With respect to the alleged inadequate supervision and
discipline, while Plaintiff refers to several complaints sustained
against Officer Prendergast, and other shooting incidents,

27

Plaintiff does not elaborate on these or explain why the City, as Plaintiff alleges, should have fired or better supervised Officer Prendergast.  Plaintiff does not identify any details of the complaints against Officer Prendergast, does not provide any details about any of the other shootings in which Prendergast was involved, and has provided no summary judgment evidence that Prendergast, prior to the incident involving Robinson, ever unlawfully used deadly force.  Consequently, Plaintiff has not demonstrated "'at least a pattern of similar violations' arising from [the City's] training, [supervision, or disciplinary procedures] that is so clearly inadequate as to be obviously likely to result in a constitutional violation."  Burge, 336 F.3d at 370. In the absence of some summary judgment evidence of deliberate indifference on the part of the City, the City is entitled to summary judgment on the § 1983 claim.

In an attempt to raise a genuine issue of material fact on the existence of a municipal policy, Plaintiff has offered the Declaration of its expert, Roger A. Clark.  Mr. Clark, a twenty-seven year veteran of the Los Angeles County Sheriffs Department, and purportedly an expert on police officer standards and training, states in his Declaration the following:

> The record clearly demonstrates that the custom and practice of the Houston Police Department in regard to street level narcotic abatement procedures was seriously flawed at the time of this incident.  On pages 3 & 4 of this declaration I noted 10 serious operational mistakes

that occurred during this incident.  They apparently continue to this day since recent material provided to me documents that these flaws continue to routinely occur on a daily basis within the Houston Police Department.

The recent depositions of both Officers CARGILL and Prendergast also confirm that unnecessary and dangerous tactics are part of the everyday operation of their unit; and that they so operate with the full knowledge and approval of their superiors in the department.

This type of operational practice is grossly incompetent and dangerous.  It is inefficient in terms of controlling narcotics within neighborhoods, and it presents unnecessary and serious risks to both the officers and public.   Unless these procedures and practices are changed, they will surely result in further unnecessary death and injury.

A listing of the 10 gross errors committed by Officers CARGILL and Prendergast has already been discussed in this report.  In this regard, the entire incident smacks of a mentality by officers who operated with impunity. As a police supervisor and unit commander for 21 years of my law enforcement career, I know from personal experience that such activities can only occur among the line personnel when supervisors in charge deliberately look the other way.  The record is clear that the responsibility for this fact falls squarely upon the Chief of Police of the Houston Police Department and his command staff.

Document No. 70 ex. 1 ¶¶ 49-52.  In sum, it appears that Clark's position is that the Houston Police Department should not condone small undercover "buy/bust" or "buy/walk" narcotics operations, because the risks attendant to such operations greatly outweigh the potential benefits.   Clark does not, however, state that the Houston Police Department's policy of allowing small undercover "buy/bust" or "buy/walk" narcotics operations results in, or is the "moving force" behind, the use of unlawful deadly force.   Clark

does note that there is a risk of unnecessary death and injury associated with such operations, but such a risk does not by itself constitute a constitutional violation.  It is only the *unlawful* use of deadly force that rises to such a level.  Clark's Declaration, taken in the light most favorable to the Plaintiff, does not connect any custom or practice of the Houston Police Department to the alleged use of unlawful deadly force.  *See* Bd. of County Comm'rs v. Brown, 117 S. Ct. 1382, 1388 (1997) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

As Plaintiff has not come forward with any summary judgment evidence of a City policy or custom that served as the moving force behind the alleged constitutional violation, the City's Motion for Summary Judgment will be granted.

## VI. Order

For the foregoing reasons, it is hereby

ORDERED that Defendant Mark R. Prendergast's Second Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (Document No. 53) is DENIED, and Plaintiff's § 1983 claims against Prendergast remain for trial; it is further

ORDERED that Defendant City of Houston's Motion for Summary Judgment (Document No. 54) is GRANTED, and Plaintiff's § 1983

30

claims against the City of Houston are dismissed with prejudice. It is further

ORDERED that Defendant Jimmy D. CARGILL's Second Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (Document No. 57) is GRANTED, and Plaintiff's claims against CARGILL are dismissed with prejudice. It is further

ORDERED that Defendants' Motion for Leave to File Supplemental Evidence and Amend Daubert Motion to Strike Plaintiffs' Expert Opinion Testimony (Document No. 55), Defendant City of Houston's Motion to Strike Opinion Testimony of Plaintiff's Expert Witness Roger Clark (Document No. 56), and Defendant City of Houston's Amended Motion to Strike Plaintiffs' Expert Witness, Roger Clark's Testimony (Document No. 65) are all DENIED, subject to being re-urged if appropriate at trial; and it further

ORDERED that Plaintiff's Motion for Fees and Contempt Because Defendant Jimmy D. CARGILL Filed a Summary Judgment Affidavit in Bad Faith (Document No. 67) is DENIED.

The Clerk will enter this Order and send copies to all counsel of record.

SIGNED at Houston, Texas on this 27TH day of January, 2004.

_Ewing Werlein, Jr._

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

31